MAY DURYEA *vs.* HENRY S. HARVEY & another.

Suffolk. January 16, 1903. — May 23, 1903.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Gift. Assignment.*

One who was considering suicide, but had not fully determined to commit it, placed in an envelope an agreement under which a certain person was bound to pay him $1,000 a month during the period of a certain lease and an order to that person to pay $500 of each monthly payment to the plaintiff. He then sealed the envelope and placed it in the hands of a third person with a direction written upon the envelope that it was to be opened by the depositary or by the plaintiff "only by my direction or on my death." Two days later he committed suicide. *Held*, that there was no gift to or for the plaintiff either *inter vivos* or *causa mortis*, as there was no delivery, the depositary holding the papers for the deceased and not for the plaintiff, and that for the same reason the transaction could not take effect as an assignment. The questions whether such property could be the subject of a gift *causa mortis* and whether a gift lawfully could be made in contemplation of suicide were not considered.

BILL IN EQUITY, filed May 16, 1901, to enforce the payment to the plaintiff of certain sums of money which the defendant Harvey by a written instrument agreed to pay to William L.

Simpson, intestate of the defendant Mabelle P. Simpson, alleged to belong to the plaintiff by virtue of gift *inter vivos* or *causa mortis* from William L. Simpson.

In the Superior Court *Fessenden*, J. made the following findings of fact:

The defendant Harvey and William L. Simpson duly executed an instrument, dated September 5, 1900, which was and is valid and bound the parties thereto, and is binding upon the defendant Simpson, administratrix. By this instrument valuable rights were created, which have existed since its execution. Under it the defendant Harvey was to pay William L. Simpson for his interest in a certain five years' lease from Houghton and Dutton and for his good will and interest in the fixtures and furniture of a business carried on on a floor of No. 3 Beacon Street, Boston, known and advertised under the name of " Dr. Hall " or " The Old Dr. Hall's Office ", the sum of $20,000, $5,000 of which was to be paid down and the balance in fifteen monthly payments of $1,000 each, to be paid on the fifteenth day of every month during the term.

On January 24, 1901, William L. Simpson made the two following instruments:

" Jan. 24, 1901. Dr. Henry S. Harvey, C/o Dr. Hall Office, 3 or 3 1/2 Beacon street, Boston, Mass. Dear Dr., — By carrying out the accompanying document — (asking you to pay to Miss May Duryea $500.00 per month beginning March 15, 1901, and same amount April 15, 1901, and each following month till our Simpson & Harvey contract of lease & sale of the Dr. Hall office, 3 Beacon street, Boston, Mass., is fulfilled) you will be doing me the greatest favor possible, and I make this request to be carried out whether I am alive or dead. . William L. Simpson.

" Dear Dr., — I ask this in good faith & trust & hope you will carry the request out in good faith and by so doing you will earn my everlasting gratitude. Sincerely yours, William L. Simpson. Jan. 24th, 1901."

" Jan. 24th, 1901. To Dr. S. Harvey, C/o Dr. Hall Office or Old Dr. Hall Office, No. 3 Beacon street, Boston, Mass. Dear Sir, — Please pay to Miss May Duryea $500 (five hundred dollars) per month of the amount due me (viz. one thousand

dollars) on lease and sale of the Old Dr. Hall Office, beginning March 15th, 1901, continuing same payment five hundred dollars, April 15th, May 15th, and each ensuing month pay to her, May Duryea, till the terms of the lease are fulfilled. William Langdon Simpson. Witness: Jacob Scheider."

Simpson placed these instruments, together with the agreement with Harvey, in an envelope which he sealed. On the outside of the sealed envelope he wrote as follows: " To be opened by Jacob Scheider, 54 West 24th street, New York City or Miss May Duryea, 124 & 126 West 36th street, New York City, only by my direction or on my death. W. L. Simpson." Thus marked the instruments were handed to Jacob Scheider, who was to follow the directions written on the outside of the envelope. William L. Simpson committed suicide on January 26, 1901. After Simpson's death Scheider handed the papers enclosed in the envelope to the plaintiff, who received them intending to hold rights thereunder and to keep them in order to maintain such rights. She has had them ever since.

William L. Simpson was considering suicide. The judge did not find that at the time Simpson made the two instruments addressed to Harvey, or at the time he handed them to Scheider, or at any time until just before committing suicide, he had fully determined to commit suicide. He had talked of a surgical operation for appendicitis, from which he said he was suffering, and had said that he might or would kill himself rather than submit to an operation. He intended that the plaintiff should have the benefits and rights under the papers addressed to Harvey if he should commit suicide. Although at times just before his death and just before making the papers addressed to Harvey and handing them to Scheider he was under the influence of liquor or drugs, he was of sound mind when he placed the papers in the hands of Scheider and was aware of and appreciated their nature and contents.

The judge found that there was no gift *inter vivos* or *causa mortis*. He made a decree ordering that the bill be dismissed; and the plaintiff appealed.

*T. J. Barry & W. A. Buie,* for the plaintiff.

*S. H. Tyng,* (*M. L. Sanborn* with him,) for the defendants.

HAMMOND, J.   William L. Simpson, fearing that his physician would advise him that a surgical operation would be necessary to prevent a fatal result from a disease from the effects of which he believed himself to be suffering, and thinking that he might commit suicide rather than to submit to such an operation, put the papers upon which the plaintiff relies in an envelope, which having sealed he caused to be placed in the hands of Jacob Scheider.   Upon the outside of the envelope he wrote: " To be opened by Jacob Scheider, . . . or Miss May Duryea, . . . only by my direction or on my death."

From the language used by him, it is plain that he did not intend that the envelope should be opened during his life without further direction from him.   There was no delivery to the plaintiff or to Scheider for her.   Scheider held the papers during the life of Simpson subject to his orders, and not for the plaintiff. Simpson had written the requests to Harvey, it is true, but the fact was not known to Harvey or to the plaintiff, and Simpson's intention plainly was to keep to himself during his lifetime the power to make a delivery of them.   There being no delivery during his life to the plaintiff or to anybody for her, there was no gift *inter vivos.   Sessions* v. *Moseley,* 4 Cush. 87, 92.

It is contended however that the transaction can be supported as an equitable assignment to the plaintiff upon a valuable consideration, consisting of an alleged debt due her for money loaned to Simpson.   Even if it be assumed that there was such a debt and that one of the purposes of Simpson in drawing up the request to Harvey was to pay or secure that debt, still we are met by the same difficulty about delivery.   There was no delivery during the life of Simpson, and he did not intend that there should be, without further direction from him.   Everything was incomplete.   Scheider was merely his depositary.   There being no delivery there was no contract arising therein during his life. The case is clearly distinguishable from *Hewins* v. *Baker,* 161 Mass. 320, and other similar cases cited by the plaintiff.

But the trial judge has found, and this finding is amply justified by the evidence, that, although at the time the papers were placed in Scheider's hands Simpson had not fully determined to commit suicide, still he was considering suicide, and he intended that if he should commit suicide the plaintiff should have the

benefit and rights for which he had made provision in the papers. Upon these findings the plaintiff contends that the transaction can stand as a gift *mortis causa.*

Here, however, as elsewhere in the case, the lack of delivery to the donee or to some one for her, passing the title to her during the lifetime of the donor, is fatal. In the case of a gift *mortis causa,* as well as in that of a gift *inter vivos,* such a delivery is necessary to the validity of the gift. In *Basket* v. *Hassell,* 107 U. S. 602, 609, Matthews, J., in the course of an elaborate and instructive opinion upon this point, uses this language : " A *donatio mortis causa* must be completely executed, precisely as required in the case of gifts *inter vivos,* subject to be divested by the happening of any of the conditions subsequent, that is, upon actual revocation by the donor, or by the donor's surviving the apprehended peril, or outliving the donee, or by the occurrence of a deficiency of assets necessary to pay the debts of the deceased donor. These conditions are the only qualifications that distinguish gifts *mortis causa* and *inter vivos.* On the other hand, if the gift does not take effect as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will." This principle has been frequently recognized in our own decisions, *McGrath* v. *Reynolds,* 116 Mass. 566, and cases cited, and is sustained by the great weight of authority. A good collection of the cases is contained in 14 Am. & Eng. Encyc. of Law, (2d ed.) 1056–1058. While the delivery may be made by the donor to some one for the donee, and in such a case is good even although not transmitted to the donee until after the death of the donor, still the delivery must be such as to transfer the title during the lifetime of the donor, a title defeasible, it is true, but complete in the donee until so defeated, the only difference in this respect between the gift *inter vivos* and the gift *mortis causa* being that the former is indefeasible while the latter is defeasible.

It follows that the intention of the deceased cannot be carried out upon the ground of a gift or contract. So far as the act related to what should take place after his decease, it was of a testamentary character, and, not being attested as required by law, it must fail of its purpose as such.

In view of the want of delivery necessary to create a gift *mortis causa,* it becomes unnecessary to consider whether the other objections raised by the defendant, namely, that the property was not the subject of such a gift, and further that such a gift cannot be lawfully made in contemplation of suicide, are well founded.

*Decree affirmed.*